[No. 7684.]

## ALMOND v. THE PEOPLE.

1. CRIMINAL LAW—*Homicide—Self Defense*—One who is where he has the right to be is not under duty to flee if attacked. He may use sufficient force to repel the attack; but if after the assailant, having received no injury, flees, he pursues him, and inflicts a fatal wound, he is guilty of murder or manslaughter, as the jury may determine; and this, even though the first shot fired by defendant was in necessary self-defense.

2. ——*Instructions*—Indictment for Murder. The deceased immediately upon the first shot fired by defendant, fled. The accused pursued him and inflicted fatal wounds. *Held* he was not entitled to an instruction based upon the assumption that the first shot produced death, where there was no evidence that such was the result of that shot.

3. ——*Information—Signature of the Prosecuting Officer*, typewritten, but followed by the name of his deputy, written with his own hand, is a compliance with Rev. Stat. § 1958.

4. ——*Reprimand to Counsel for Defendant*, provoked by the conduct of counsel in the examination of a witness, in defiance of the previous ruling of the court, and not relating to any matter pertinent to the case is harmless. ·

*Error to Lincoln District Court.*—Hon. J. W. SHEAFOR, Judge.

Mr. J. E. BARNGROVER, Mr. B. C. HILLIARD, for plaintiff in error.

Hon. BENJAMIN GRIFFITH, Attorney General, Hon. FRED FARRAR, Attorney General, Mr. THEODORE M. STEWART, JR., Assistant Attorney General, Mr. FRANK C. WEST, Assistant Attorney General, for The People.

Mr. JUSTICE GARRIGUES delivered the opinion of the court:

1. Defendant, Thomas 'Almond, was convicted of murder of the first degree for killing one V. H. Barger, July 13, 1911, and sentenced to life imprisonment. Deceased married defendant's sister, and the homicide grew out of trouble between the two families. They lived on adjoining homesteads, their dwellings being not over 100 yards apart, with no fence between. When Barger located his homestead, he thought it took in a well and sheep cabin on the public domain, but a survey thereafter disclosed these were over the line on the adjoining tract. He then got his wife's mother, Mrs. Almond, to come to Colorado and file on this quarter in order that he might have the use of the well. Soon after this, at her invitation, her son, the defendant, with his family came to reside with her, which resulted in ill feeling and frequent quarrels between the men. The morning of the homicide, while deceased's wife and 14 year old daughter were working in their garden, he started for the well to water some stock, carrying a large water bucket on each arm. His 12 year old son accompanied him, driving a team hitched to a cultivator. In going to the well, they passed through the mother's yard, and close by the corner of the house, in which defendant lived. Up to this point, there is no conflict in the testimony; but the evidence is conflicting as to what followed. The boy testified that as they passed the corner of the house, along the road to the well, he heard defendant say to his father: "God dam you, don't drive through my yard," which was immediately followed by a shot that fright-

ened the horses and caused them to run away with him. Relative to this part of the transaction the defendant said that as Barger and his son were coming through the door-yard, he requested them not to drive through there because, as he said, he was afraid they would run over his baby; that Barger, with an oath, immediately drew a butcher knife from under the bib of his overalls, and with a vile epithet, started towards him and threatened to kill the whole family; that he then stepped back in the door, and getting his rifle, came outside and told deceased to stop, which he did not do, but kept approaching him with the knife raised, and repeated the threat; whereupon he fired one shot at deceased's head. There is no evidence as to where this shot took effect, if at all; but conceding defendant's account of the attack to be true, it evidently caused Barger to desist, for he immediately turned and ran, pursued by defendant, who continued shooting at him from the rear. When he had gone about 150 yards, he fell to the ground, and his wife and daughter, whose attention had been attracted by the shooting, testified that after he fell, they saw defendant run up and shoot him in the face as he lay helpless on the ground. This was the last shot, and Barger died immediately thereafter. While deceased was retreating, defendant fired many shots at him, eight or ten of which took effect, and all but two entering his body from the rear. Of the two shots that struck him in front, one cut his chin, while the other entered at the inner corner of the eye, inflicting a wound that would cause immediate death. Three of the shots entered deceased's back, passed through his body, and would have produced death, though perhaps not immediately. Another shot broke his leg, causing him to fall, after which the defendant fired the last shot. When the officers arrived on the scene, they found a butcher knife in the right hand of deceased, which Mrs. Barger and the daughter testified

had been loaned by them to defendant's family shortly before, and had not been returned up to the time of the homicide. Although the body of deceased, his clothing and the buckets he carried, were covered with blood, none was found on the knife in his hand.

2. It cannot be determined whether the jury believed the story of the boy, or the defendant, as to what occurred immediately preceding the first shot; but defendant was entitled to instructions upon the theory that they might believe his version. .For this purpose, we will therefore assume his account to be true. Defendant was where he had a right to be, and if attacked, was not obliged to flee. He could use sufficient force to repel the attack, but could not lawfully do more, and would only be justified in taking the life of deceased in order to save his own, or to prevent his receiving great bodily harm. He claims the first shot was fired in necessary self-defense. Conceding this, that plea cannot avail as to the subsequent shot or shots which produced death, and were fired at a time when he was no longer in danger. It is uncontroverted, that immediately after the first shot, deceased abandoned the attack and fled. The firing of the subsequent shots could not have been from any reasonable fear of losing his life or receiving great bodily harm, and under such circumstances, unless the first shot killed the deceased, defendant would be guilty of murder or manslaughter, as the jury might determine.—*Chestnut v. State*, 112 Ga. 366, 37 S. E. 384.

3. Defendant concedes this latter proposition, but contends that if the first shot was fired in necessary self-defense and produced death, then the firing of the subsequent shots, although not in self-defense, would not justify the jury in finding him guilty of murder, if they did not hasten or accelerate death. (Citing *Rogers v. State*, 60 Ark. 76, 29 S. W. 892, 31 L. R. A. 465, 46 Am. St. 154.) Upon that theory he requested the court to

instruct the jury that if the first shot was fatal, and was fired in necessary self-defense, and the defendant fired subsequent shots which would also be fatal, after deceased was fleeing, and had abandoned the attack, that he would not be guilty of murder or manslaughter unless some of the subsequent shots contributed to or hastened death. The court refused the request and declined to give any instruction covering that point. Irrespective of whether the instruction requested correctly states an abstract proposition of law, there was no evidence upon which it could be based in this case. The shot that entered the eye caused immediate death; but there is no evidence that it was the first shot. Barger died immediately after the last shot, which was not fired in self-defense. Under the facts disclosed by the testimony, the instruction was properly refused.

4. Error is assigned because the court refused to quash the information on the ground that the name of the district attorney was not subscribed thereto by himself or by his deputy as required by section 1958 R. S. 1908. The information concludes: "Joseph E. Ferguson, District Attorney, by W. M. Purcell, deputy District Attorney," the first name being written with a typewriter, and the second being the pen and ink signature of the deputy. Defendant claims that writing the name of the district attorney with a typewriter, does not comply with the statute. This is without merit. When the district attorney's name is affixed with authority to an information which is signed by his deputy, it is a sufficient compliance with the statute.

5. The 28th assignment relates to remarks of the court during the trial, which it is contended were prejudicial to the rights of the defendant, and our attention is called particularly to the following language:

"Now Mr. Hilliard, I will tell you once more not to ask any more questions about that matter; the objection

to that has been sustained several times. If you persist in it, I shall have to take some strenuous measures to prevent these questions, and if necessary I will make an example of you in preserving the dignity of this court.''

It appears that these remarks were called forth by counsel's conduct in examining a witness. They were addressed to him personally, did not pertain to any matter which was pertinent or relevant to the case, and we cannot say that the rights of the defendant were in any way prejudiced by this occurrence.

6. The remaining assignments relate to rulings of the court on the admission and rejection of testimony. Having carefully examined such as are called to our attention in the abstract and brief of plaintiff in error, we find none which would justify a reversal of the judgment.

The evidence seems to have been fairly presented to the jury under instructions fully covering the case, and finding no prejudicial error in the record, the judgment will be affirmed.

*Affirmed.*

CHIEF JUSTICE MUSSER and Mr. JUSTICE SCOTT concur.