## No. 27880

**The People of the State of Colorado v. John Martinez Sepeda**

(581 P.2d 723)

Decided June 26, 1978.                    Rehearing denied July 17, 1978.

J. D. MacFarlane, Attorney General, Jean E. Dubofsky, Deputy, Edward G. Donovan, Solicitor General, Linda Palmieri Rigsby, Assistant, for plaintiff-appellee.

Rollie R. Rogers, State Public Defender, James F. Dumas, Jr., Chief Deputy, Mary G. Allen, Deputy, Thomas M. Van Cleave III, Deputy, for defendant-appellant.

*En Banc.*

MR. JUSTICE LEE delivered the opinion of the Court.

Defendant-appellant John Martinez Sepeda, Jr. was convicted, by jury, of second-degree murder,[1] attempted second-degree murder (two counts),[2] reckless endangerment (two counts),[3] and third-degree assault (two counts),[4] in the District Court of Weld County. Defendant appeals his conviction and urges seven separate grounds that he contends individually and collectively warrant reversal. We find that none of defendant's claims warrant reversal and affirm his conviction.

During the evening of June 28, and into the early morning hours of June 29, 1975, John Sepeda (defendant), Blas Calderon (John's cousin), Gloria Ortega (John's girl friend) and three of their friends were drinking beer on the porch of defendant's house in Greeley. Although it is not clear whether defendant and his friends were intoxicated, they had been driving around the town of Estes Park and drinking for most of the day.

At about 1:30 a.m., Blas Calderon went across the street to buy a package of cigarettes at the "Taco Bell" restaurant. He met Ken Griego, Thomas Griego and John Korgan in the restaurant's parking lot, and accompanied them into the restaurant where he met Jerry Lujan, David Lujan and Jose Maestas. Words were exchanged and Blas was told to leave. As he started across the street, he turned and shouted an obscenity at the group. All six jumped up from their tables and began to chase Blas.

---

[1] Section 18-3-103, C.R.S. 1973.
[2] Section 18-2-101, C.R.S. 1973.
[3] Section 18-3-208, C.R.S. 1973.
[4] Section 18-3-204, C.R.S. 1973.

Defendant and his friends on the porch saw Blas being chased and ran to his aid. A gang-fight ensued, with the six men from Taco Bell apparently getting the better of defendant, Blas, and their two friends.

There was conflicting testimony as to whether members of either group had weapons. A single-edged razor blade was found at the scene. There was also conflicting testimony as to how long the fight lasted. It is undisputed, however, that soon after the fight began defendant ran into his house and got a .22-caliber pistol. He came out and fired a warning shot. A bullet was later recovered, embedded high in a sign one-half block from the house.

There was testimony that when the first shot was fired the fight ended and the participants began to run away. Defendant testified to the contrary, however, stating that when the fight did not cease after the warning shot he fired into the crowd to try to break up the fray. Defendant related that from this point on he had no memory of what happened.

The evidence showed that defendant fired at least three shots into the crowd, hitting Jose Maestas, David Lujan and Jerry Lujan. It is undisputed that the fight was over at this point. Defendant then approached Jerry Lujan, who was standing by a fence, and shot him again. Witnesses placed defendant somewhere between three and six feet from Lujan at the time the final shots were fired. The testimony was in conflict as to how long defendant faced Lujan before firing again and whether any words were exchanged between them. Lujan died of these wounds.

Defendant left the scene of the fight and drove to the home of a friend, Apolonio Gueroz. Gueroz drove defendant and Gloria Ortega to the home of another friend, Moise Acquirre. According to Gueroz and Ms. Ortega, defendant made several incriminating statements during this period and seemed extremely frightened.

Acquirre drove defendant to New Mexico, where he stayed for a few days before voluntarily surrendering to police.

## I.

Appellant's first argument for reversal is that the method of jury selection used in Weld County systematically excluded Spanish-surnamed persons who comprised 15.4% of the population of Weld County, according to the 1970 census.[5] We do not agree. The record does not support such a contention.

The first step in the jury selection procedure was to obtain voter registration and driver and chauffeur- license lists for Weld County. The lists were then combined and duplicate names were eliminated. The resulting

---

[5] The bases for this figure and others contained herein were not clearly established in the record, but the parties seem to have accepted them as valid. For the purpose of this opinion, we do also, even though the jury panel was not selected until February 1976. We further note that there was no evidence as to how many of the 15.4% Spanish-surnamed persons were eligible for jury service.

list contained 82,000 names. Each name on this list was assigned a random number and, using a key number system, the number of names was reduced to 5,489. This list was called the "Master List." It contained only 569 or 10.4% Spanish-surnamed persons.

Questionnaires were then sent to the people whose names were on the Master List. Two thousand seven hundred forty-nine persons returned these questionnaires and of these 259 or 8.7% were Spanish-surnamed. From this list, 350 names were selected for the jury list. The jury list contained 30, or 8.6%, Spanish-surnamed persons. The jury at defendant's trial contained a single Spanish-surnamed person, who sat as a second alternate.

A city and county directory is published for Weld County, and defendant contends that, if this were used to select the jury pool, the disparity between 15.4% and 10.4% would not exist. The directory was not used because it was not produced in the computer media used by the state judicial department in its jury selection procedures. It was determined by the judicial administrator and the chief judge of the judicial district that the conversion could not be accomplished by reason of a lack of funding.

Appellant asserts that this system creates a jury array that violates his Fifth and Sixth Amendment rights and the terms of Colorado's Uniform Jury Selection and Service Act, section 13-71-101, *et seq.,* C.R.S. 1973. We first address defendant's constitutional claims.

■ The Supreme Court of the United States has stated time and again that the constitutional guarantees of due process and a trial by jury mandate that juries be selected from a representative cross-section of the community. *E.g., Taylor v. Louisiana,* 419 U.S. 522, 95 S. Ct. 692, 42 L.Ed.2d 690; *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567; *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599; *Strouder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664. There is no requirement, however, that each petit jury reflect the exact ethnic proportion of the population to which the defendant belongs. *Taylor v. Louisiana, supra; Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536.

The jury selection procedure here involved differs in three significant aspects from many dealt with by the United States Supreme Court. First, there is no showing of any opportunity in the process for any human bias or prejudice to operate to alter the ethnic proportions in the jury pool. *Cf. Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (jury pools selected by jury commissioners); *Alexander v. Louisiana, supra* (jurors picked from questionnaires returned; each questionnaire had a space marked for race); *Whitus v. Georgia, supra.* We point out that in the instant case, after the lists to be used are selected, the process is completely random and no personal discretion is involved.

Second, we do not have a disparity between the proportions of Spanish-surnamed persons in the community and those in the jury pool so great as to present a prima facie case of discrimination. *Compare Castaneda v. Partida, supra* (county was 79% Mexican-American, jury list was 39% Mexican-American), *with Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (25% of county is Black, only 10 to 15% of juries are Black; no discrimination shown by this statistic alone). We have here, at most, a 6.8% disparity.

Third, there has been no showing here of total exclusion or a mere token representation of a particular ethnic group. *Cf. Alexander v. Louisiana, supra; Whitus v. Georgia, supra.*

■ Ultimately, then, the issue presented is essentially this: Is it constitutionally permissible to use only the voter registration and driver and chauffeur-license lists, and not the Weld County directory, in assembling the list of names for the Weld County jury pool?

In addressing this issue, we adopt the test inferred from *Taylor v. Louisiana,* 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690, and by the Tenth Circuit Court of Appeals in *United States v. Test,* 550 F.2d 577. That test consists of three factors, all of which must be established by the defendant in order to make out a prima facie case of discrimination in jury selection procedures. The three factors are: (1) that a distinctive and cognizable group exists; (2) that the group is systematically excluded from the jury selection process; and (3) that the resulting jury pool fails to be reasonably representative of the community. *United States v. Test, supra.*

■ We assume, without deciding, that Spanish-surnamed persons represent a cognizable class of people. Thus, for the purposes of this case, the crucial prong of the test is the second one. From a reading of the United States Supreme Court cases in this area, it is clear that systematic exclusion will be found only when there is evidence, direct or inferred, of purposeful racial discrimination over a period of time by a government agency.[6] As we noted above, there is no evidence of purposeful discrimination in the instant case. To the contrary, efforts were made specifically to increase the proportion of Spanish-surnamed persons on the jury lists. Attempts to obtain welfare and income tax lists failed. (These are confidential and protected by statute from disclosure in Colorado.) Other sources of names were considered and rejected as sex-biased (*i.e.,* telephone books, utility company lists). Finally, an attempt was made to procure a copy of the Weld County directory, but, as noted above, it was not

---

[6] "Recent cases have established the fact that an official act is not unconstitutional *solely* because it has a racially disproportionate impact. *Washington v. Davis,* 426 U.S. 229, 239, 96 S.Ct. 2040, 2047, 48 L.Ed.2d 597 (1976); *see Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)." (Emphasis supplied.) *Castaneda v. Partida, supra.*

produced in the computer media used by the judicial department in composing the jury lists.

We also note that there has been no showing of any significant discrimination over a period of time here. It has not been demonstrated that Spanish-surnamed persons have consistently been underrepresented on juries in Weld County.

The third prong of the test, that the jury pool has failed to be reasonably representative of the community from which it is drawn, has not been met in this case. "Reasonably representative" does not mean exactly proportionate and, if the statistics cited above are indeed correct, we have a difference of 5% (15.4% minus 10.4%) or a 31% comparative disparity (5% divided by 15.4%) between the proportion in the jury pool. While the selection process may not be perfect, we cannot say that the jury pool is not reasonably representative of the community.

■ Thus, we hold that the use of the voter registration lists and driver and chauffeur-license lists are constitutionally sufficient in arriving at the jury pool for Weld County. *Accord, United States v. Test, supra.*

■ We also reject defendant's statutory attacks on the Weld County jury selection procedure. We find that, in light of the above discussion, the requirement of the Uniform Jury Selection and Service Act that the jury be selected at random from a fair cross-section of the population is adequately met.[7]

Defendant also contends that the Weld County directory is "available," within the meaning of Rule 7 of the Colorado Rules of Jury Selection and Service, and, thus, must be used. We do not agree.

Rule 7(b)(3) of those rules invests the chief judge in a judicial district with the discretion to determine the availability and applicability of lists to supplement the voter registration lists in assembling the jury pool for the district. This rule also directs the state court administrator to assist the chief judge in this task. Here, the administrator has determined that the Weld County directory is not "available" because of funding problems. We do not find an abuse of discretion in this case.

■ Finally, we observe that the defendant has totally failed to demonstrate that the jury which convicted him was racially biased or prejudiced against him, and that as a consequence he did not receive a fair trial. In the absence of a method of jury selection that systematically excluded members of his ethnic group (which was not present in this case), or which in some other manner resulted in a fundamentally unfair jury, we will not

---

[7] "Legislative declaration. It is the policy of this state that all persons selected for jury service shall be selected at random from a fair cross section of the population of the area served by the court, and that all qualified citizens shall have the opportunity in accordance with the provisions of this article to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose." Section 13-71-102, C.R.S. 1973.

conclude that the jury in this case did not give fair consideration to the evidence presented at trial and to the law as contained in the instructions.

## II.

Appellant next submits that he suffered material prejudice in the preparation of his case because the trial court permitted the late endorsement of a witness by the prosecution. The record does not bear out this claim.

On the first Monday of the trial, the prosecution moved for the endorsement of an additional witness, Dixie Korgan. Ms. Korgan is a sister of Don Korgan (one of the Lujan-Griego group at the Taco Bell), and was apparently an eyewitness to the shooting. Defendant argues that the prosecutor had known about Ms. Korgan from the time the offense occurred and gave no substantial reason for late endorsement. The prosecution contends that defense counsel was given adequate notice of its intent to move for late endorsement. In fact, defense counsel interviewed Ms. Korgan on the day before trial. Because of this, the trial court granted the prosecutor's motion to endorse. Defendant did not move for a continuance.

Granting leave for the late endorsement of witnesses is within the sound discretion of the trial court. *People v. Bailey,* 191 Colo. 366, 552 P.2d 1014; *People v. Gable,* 184 Colo. 313, 520 P.2d 124. In *Bailey,* we held that:

"[i]n order to constitute reversible error where there is a late endorsement of a witness, the defendant must show that he was prejudiced because the appearance of the witness surprised him and because he did not have adequate opportunity to interview the witness prior to trial. *Reed v. People,* 171 Colo. 421, 467 P.2d 809 (1970); *Stoudt v. People,* 156 Colo. 568, 400 P.2d 670 (1965); *Eckhardt v. People,* 126 Colo. 18, 247 P.2d 673 (1952); *Boykin v. People,* 22 Colo. 496, 45 P. 419 (1896). Furthermore, even where such prejudice is shown, the granting of leave for late endorsement is not reversible error unless the defendant makes a timely request for a continuance which is denied by the trial court. *Reed v. People, supra; Gorum v. People,* 137 Colo. 1, 320 P.2d 340 (1958); *Askew v. People,* 23 Colo. 446, 48 P. 524 (1897)."

There, as here, defendant failed to move for a continuance. Moreover, defendant has failed to demonstrate any prejudice as a result of the late endorsement. We find no abuse of discretion in allowing the late endorsement under the circumstances of this case.

## III.

At trial, two photographs which depicted the wounds of the deceased, Jerry Lujan, were admitted over the objections of defendant. Defendant argues that those pictures served to incite the passions and prejudices of the members of the jury. Defendant further contends that the pictures had no evidentiary value because the condition of the body and the cause of death were stipulated to and described in detail by prosecution witnesses.

■ Again, we deal with a matter that is within the discretion of the trial judge. The trial court judge must weigh the probative value of the photographs against the inflammatory effect that they may have on the jury. The photographs may be admitted unless the latter effect far outweighs the former purpose. *People v. Pearson,* 190 Colo. 313, 546 P.2d 1259; *People v. McCrary,* 190 Colo. 538, 549 P.2d 1320. Pictures may be introduced to graphically portray the scene of the crime, appearance of the victim, and any other matters which are competent for a witness to describe in words. *People v. Moreland,* 193 Colo. 237, 567 P.2d 355, *People v. Steele,* 193 Colo. 87, 563 P.2d 6.

Defendant mistakenly relies on *Archina v. People,* 135 Colo. 8, 307 P.2d 1083. In *Archina,* we held that, where photographs have *no* probative value, and serve *only* to incite passion and prejudice in the jury, they should be excluded.

■ The instant case, however, falls within the ambit of *Jorgenson v. People,* 174 Colo. 144, 482 P.2d 962. There, as in the present case, there was no question but that defendant caused the death of the victim. In holding that the pictures were properly admitted, the court stated that, "[c]ertainly a doctor could testify to the location of the wounds, and the cause of death. The fact that defendant admitted the killing does not prevent the state from showing the circumstances surrounding it."

Thus, there is no reason to exclude pictures simply because a witness can testify and describe the wounds. If pictures could be excluded on that basis, there would be few cases where a picture would ever be admitted. As has been said, one picture is worth a thousand words, and the introduction of such photographs served to prevent confusion and misconception on the part of the jurors. We find no abuse of discretion in the admission of the photographs in this case.

## IV.

■ Defendant asserts that the court permitted improper cross-examination of a key defense witness at trial, and then improperly denied a motion for mistrial based on this questioning.

The prosecutor began his cross-examination of defense witness Edward Lozano by asking him when he had last spoken with defense witness Gilbert Ramirez. Defense counsel objected on relevancy grounds and the trial court overruled the objection with the following statement:

"Well, assuming the relevancy I'll override the objection subject to striking if it proves to be irrelevant."

Lozano then answered that he and Ramirez had lunched together that day. He testified that nothing was said about what either of them would testify to at trial. The court then directed the parties and this witness into chambers.

In chambers, the witness was questioned further by both parties. The court noted that the sequestration order had been violated, but that it was

satisfied nevertheless that no collusion by the witnesses had occurred. In the presence of the jury, the court gave the following instruction:
"The questioning of this witness concerning conversations with another witness has proven to be immaterial to the issues of this case and the court now orders such testimony to be stricken and directs the jury to disregard it."

The court's instruction clearly and unequivocally directed the jury to disregard the questioning, and we presume that the jury understood and followed the instructions of the court. *People v. Motley,* 179 Colo. 77, 498 P.2d 339. No evidence was presented to rebut that presumption in this case, and we do not find the district attorney's cross-examination so prejudicial as to require reversal.

## V.

The court refused to include the following in its instruction on self-defense to the jury:
"You are further instructed that a man has a right to defend himself or another against the unlawful assault and attack of another and may repel force by force. He is not required to retreat but may pursue the adversary until he has secured himself or another from such danger; and he is to estimate the danger and he is justified in acting upon the circumstances as they reasonably appeared to him at the time and may have appeared to a reasonable person."

In *Boykin v. People,* 22 Colo. 496, 45 P. 419, this court held that if a defendant is where he has a right to be, and he is assaulted by the deceased without first provoking the assault, the defendant need not retreat to the wall before defending himself, but may stand his ground and even, in some circumstances, pursue his assailant until the assailant has been disarmed or otherwise deterred from his violent purpose. A defendant may not rely on the *Boykin* rule when he is no longer under attack, but has himself become the assailant. *Almond v. People,* 55 Colo. 425, 135 P. 783; similarly, *People v. Favors,* 192 Colo. 136, 556 P.2d 72. In the instant case, it is undisputed that the fight ended no later than when defendant fired into the crowd. There is no question but that defendant, holding a gun on the unarmed Jerry Lujan, was under no further danger. In such circumstances, defendant became the assailant when he continued to fire at his unarmed and apparently helpless foe. Since the requested instruction was totally irrelevant to these facts, the trial court properly refused to give it.

## VI.

The jury was instructed on the affirmative defense of intoxication, section 18-1-804, C.R.S. 1973, but was permitted to consider this defense only with respect to the crimes of first-degree murder, attempted first-degree murder, attempted second-degree murder and manslaughter. Defendant contends that it was reversible error, in light of our recent

24

decision in *People v. Cornelison,* 192 Colo. 337, 559 P.2d 1102, for the court not to have permitted consideration of the defense of intoxication with respect to second-degree murder.

We note initially that defendant correctly states the law as propounded in *Cornelison.* We stated there that, under section 18-1-804(1), C.R.S. 1973, "* * * a defendant's voluntary intoxication may be evidence of his inability to entertain the specific intent required for conviction of second-degree murder."[8]

The court's failure to instruct the jury on this point was error under *Cornelison, supra,* but in the context of this case it was not reversible error.

In *Cornelison,* defendant faced the single charge of first-degree murder, and was convicted of the lesser included offense of second-degree murder. The jury had no opportunity to assess defendant's claim of voluntary intoxication as negating specific intent with respect to any other charge. In the instant case, the jury was instructed to consider, and apparently rejected, defendant's defense of voluntary intoxication with respect to the charge of attempted second-degree murder. It is logically inconsistent to suggest that the jury would have found that the requisite specific intent was negated with respect to second-degree murder, when they found the requisite specific intent was not negated with respect to attempted second-degree murder. *Cf. People v. Mullins,* 188 Colo. 23, 532 P.2d 733. Thus, we find the error to be harmless.

## VII.

■ Defendant's final assignment of error concerns the impropriety of certain statements made by the prosecuting attorney during his closing argument to the jury. The following improprieties are alleged by defendant to constitute grounds for reversal:

1. The prosecutor made several comments on the credibility of the defendant as a witness, specifically with respect to defendant's claim that he suffered a memory loss and could not recall the shooting incident.

2. The prosecutor appealed to the jury as the "conscience of the community" and admonished them to convict defendant for the safety of the community.

3. The prosecutor commented that when defendant went into his house to get his gun he might have "even had to load the clip, he didn't say that." Defense counsel objected to this statement on the grounds that it was unsupported by the evidence. The objection was overruled.

---

[8] We note that after the announcement of the *Cornelison* decision the legislature changed the law relating to the affirmative defense of intoxication. The amended statutory language reads: "Diminished responsibility due to lack of mental capacity or self-induced intoxication is not a defense to murder in the second degree." Section 18-3-103(2), C.R.S. 1973 (1977 Supp.). In the present case, both the crime and the trial occurred prior to the adoption of this amendment.

4. The prosecutor characterized criminally negligent homicide as a "little thing" and argued to the jury that, rather than convict defendant of that, they should acquit him altogether. The court overruled defense counsel's objection to this comment.

The first two improprieties noted above were not objected to at trial, and we have held on numerous occasions that prosecutorial misconduct in closing arguments rarely, if ever, is so egregious as to constitute plain error, within the meaning of Crim. P. 52(b), so that we may consider it on appeal absent a contemporaneous abjection. *See, e.g., People v. Plotner,* 188 Colo. 297, 534 P.2d 791; *People v. Simbolo,* 188 Colo. 49, 532 P.2d 962. We find no misconduct so flagrant as to constitute plain error.

The defendant did contemporaneously object to the prosecutor's statement to the jury that the defendant loaded the clip with bullets before inserting the clip in the gun. Since this was not in evidence, it was clearly improper for the prosecutor to state it in closing argument. *See ABA, Standards Relating to the Prosecution Function* § 5.8(a). Even had the event occurred and been supported by evidence at the trial, it would be relevant only to the defendant's premeditation. Since defendant was not convicted of a crime containing the element of premeditation, we find no grounds for reversal based on this prosecutorial indiscretion.

Finally, the defendant contemporaneously objected to the prosecutor's characterization of criminally negligent homicide as a "little thing." Of course, it is improper for an attorney to misstate or misinterpret the law to the jury during his closing argument. *Longinotti v. People,* 46 Colo. 173, 102 P. 165. It is clear, however, that the remark neither misstated the elements of the offense nor misinterpreted for the jury how the law should be applied to the facts. Thus, we conclude the ill-advised remark did not constitute reversible error.

The judgment is affirmed.

MR. JUSTICE CARRIGAN dissents as to Part I.

MR. JUSTICE CARRIGAN concurring in part and dissenting in part:

While I concur in the remainder of the majority opinion, I cannot accept the Orwellian premise of Part I that a defendant's right to trial by a jury representing a fair cross-section of his community must be subordinated to the language shortcomings of a computer. To put the matter in proper perspective, it is essential to recall that not only the defendant in this murder case, but nearly all the parties to the fracas out of which the killing arose, were Chicanos. Census figures placed the number of Spanish-surnamed persons in Weld County at 15.4% of the county's population. Yet the jury selection methods employed ultimately reduced Spanish-

surnamed persons on the jury list to 8.6%. Of the twelve jurors who actually decided the defendant's fate, not one was Spanish-surnamed. To me the gist of the majority opinion on this point is summed up in the following paragraph:

"A city and county directory is published for Weld County, and defendant contends that, if this were used to select the jury pool, the disparity between 15.4% and 10.4% (at the first stage of the selection process) would not exist. The directory was not used because it was not produced in the computer media used by the state judicial department in its jury selection procedures. It was determined by the judicial administrator and the chief judge of the judicial district that the conversion could not be accomplished by reason of a lack of funding." Slip Opinion, p. 5. (Parenthetical matter added.)

I simply cannot accord any place in our justice system to the notion that the fundamental right to a fair, representative jury can be subordinated to the convenience of a computer. Even though, as the majority opinion states, there may be no constitutionally recognized right to trial by a jury of one's "peers" in the sense of persons of the same racial or ethnic background, we are not here dealing with minimum constitutional standards. In fact there is no need to reach the constitutional issue, for the real issue here is one of judicial administration policy subject to the powers expressly granted to this court by the Colorado Constitution. *Colo. Const.,* Art. VI, sec. 2(1)[1] and sec. 21.[2]

Moreover our concern cannot stop when we are satisfied that a jury selection procedure is actually fair, for the procedure employed must have the appearance of fairness as well. Courts, having neither police nor militia to enforce their orders, must depend for their authority on the people's confidence that their official acts and procedures are fundamentally fair. Therefore our judicial system ought constantly to strive for a quality of justice above the bare minimum required of us by the United States Constitution as expounded by the Supreme Court.

The Colorado Rules of Jury Selection and Service promulgated by this court declare our policy "to provide for jury service by persons selected at random from a fair cross-section of all citizens qualified to serve." C.R.J.S.S., Rule 2. These rules implement the Uniform Jury Se-

---

[1] "(1) The supreme court . . . shall have a general superintending control over all inferior courts, under such regulations and limitations as may be prescribed by law."

[2] "*Rule-making Power.* The supreme court shall make and promulgate rules governing the administration of all courts and shall make and promulgate rules governing practice and procedure in civil and criminal cases, except that the general assembly shall have the power to provide simplified procedures in county courts for claims not exceeding five hundred dollars and for the trial of misdemeanors."

lection and Service Act,[3] which similarly requires random selection from a fair cross-section of the population to assure implementing the declared state policy "that all qualified citizens shall have the opportunity . . . to be considered for jury service . . . ."[4]

Our rules provide the means by which this court could, and should, require more than minimal compliance with constitutional requirements. Rule 7(b) provides that the master lists for jury selection may be supplemented with additional lists, "if available," in order to increase the likelihood that prospective jurors will be selected from a list truly representative of the community's population. The state court administrator and the chief judge of each district are to determine whether supplemental lists are "available" and "applicable" for these purposes. C.R.J.S.S. 7(b)(3). Directories like the one here involved are expressly mentioned as sources for the master jury list.

Thus, the dicision whether to use sources such as these directories in putting together the master jury lists is left to officers directly subject to this court's supervisory powers. Therefore this court has an opportunity to ensure employment of the fairest practicable methods of jury selection, not merely those which marginally satisfy minimum requirements.

But in this case, the majority have simply deferred to the judgment of the state court administrator, who determined that the Weld County directory was not "available" because of the expense problems involved in converting it to computer language. The court simply elects not to interfere with the administrator's decision.

I object to this portion of the opinion because it abstains from deciding an important matter of judicial policy, and flatly upholds the administrator's decision on the matter without any adequate factual basis.

Given the importance of the right here involved, it is essential that this court ascertain that there be substantial justification for any dilution of it. Being mindful of Judge Learned Hand's injunction: "Thou shalt not ration justice," I would be troubled by *any* decision, based solely on budgetary reasons, to forego using a list providing the fairest available cross-section of the community. In this case, however, the court makes its decision with no evidence in the record even roughly quantifying the expense of converting the county directory to computer language.

The record indicates only the generality that converting the directory would "take a lot of time and a lot of money," and that the court administrator had decided as a policy matter that directories are not "available" whenever such conversion is required. Certainly the court's decision upholding the administrator's policy determination should not be controlled

---

[3] Section 13-71-101, *et seq.*, C.R.S. 1973.
[4] *Id.* §13-71-102.

by budgetary concerns not even documented by evidence.

It is also unclear from the record to what extent use of the Weld County Directory would improve the jury representation of the Spanish-surnamed. It is of course conceivable that a very slight improvement would not justify a very large expense. For that reason, I would remand the case for further evidence on these two points, both of which are essential to making an intelligent judgment whether exclusion of the directory is justifiable. If excessive expense is to be recognized as a determinative factor in policy decisions affecting the fairness of jury selection — *i.e.,* if we must put a price on the right to trial by a fair cross-section of the community — at least we should know and publicly state how much expense is being used to justify how much underrepresentation. If we allow a non-specific representation of the expense of computerization to control our decision of what is truly a fair cross-section of the community, we blindly subvert the fundamental right of the jury trial to dubious concepts of administrative efficiency.

Ironically, were it not for the modern, quantitatively efficient computer, we might have, in this instance, a more qualitatively efficient jury selection system, for the Weld County Directory is already in human language and would require no expensive conversion but for the computer.