**Lester SALAZAR, Petitioner,**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 92SC755.**

Supreme Court of Colorado, En Banc.

March 14, 1994.

Shand, McLachlan & Newbold, P.C., Michael E. McLachlan, Durango, for petitioner.

Gale A. Norton, Atty. Gen., Timothy M. Tymkovich, Sol. Gen., John Daniel Dailey, Deputy Atty. Gen., Robert Mark Russell, First Asst. Atty. Gen., Matthew S. Holman, Asst. Atty. Gen., Criminal Enforcement Section, Denver, for respondent.

Justice SCOTT delivered the Opinion of the Court.

Lester Salazar stands convicted of attempted murder in the first degree and reckless endangerment after a jury trial. We granted certiorari to review *People v. Salazar*, No. 91CA0846, slip op. (Colo.App. Sept. 10, 1992) (not selected for official publication), to determine whether the court of appeals erred when it affirmed Salazar's conviction despite the prosecution's violations of the rules of discovery. Because the defendant was not prejudiced by the discovery violations, we affirm the conviction and the holding of the court of appeals.

## I.

In August, 1990, petitioner, Lester Salazar (Salazar) attended a party in Durango, Colorado. He was accompanied by his brother, Brian Salazar (Brian) and their friend, Danny Herrera (Herrera). That night, Salazar, Brian, Herrera, and another friend, Wilfred Albo (Albo), left the party armed with a .22 caliber semi-automatic pistol, a .22 caliber automatic rifle and two shotguns. Sometime after leaving the party, Salazar and his companions got into a car driven by Chris Rohrer (Rohrer) with the intention of confronting the person who threatened Albo with a gun earlier that evening.

While riding in Rohrer's car, Albo identified the driver of an adjacent car, David Rael, as the person who threatened him. Rael, who was accompanied by Amy Barnes, his girlfriend, was driving in the same direction as Rohrer. As both vehicles approached the stoplight at 14th Street and Main Avenue in Durango, Salazar and his companions began shouting insults and profanities at Rael and Barnes. At the intersection, Rohrer's car pulled up alongside Rael's Buick. Amid the barrage of insults, Salazar, who was seated in the rear of Rohrer's car on the passenger side, asked if he should shoot at the people in the other car. At that

time the light changed and both cars started in the same direction. After following for about two miles, Rohrer again pulled even with Rael's vehicle and at least two shots were fired from Rohrer's car.

Rohrer was one of several witnesses at the trial. He testified that as soon as he had pulled even with Rael's car, he heard a shot from Salazar's position in the back seat and the breaking of glass. Then, his testimony continued, as he slammed on his brakes he heard another shot, this one coming from the front passenger seat where Brian was seated holding a pistol. Rohrer testified that immediately after the second shot was fired, he turned his car around and drove away.

Both shots struck Rael's vehicle: one hit the base of the driver's side door, the other passed through the driver's side window narrowly missing Rael's head. Shortly thereafter, Salazar and Brian were arrested and both were charged with attempted first-degree murder, § 18–3–102(1)(a), 8B C.R.S. (1986), and reckless endangerment, § 18–3–208, 8B C.R.S. (1986).[1]

After a four-day trial, the jury found Salazar guilty on both charges. Claiming that he was denied his right to a fair trial due to discovery violations occurring prior to and during trial, Salazar filed a motion for a new trial. In his motion, Salazar cited two specific violations: first, that the People failed to disclose exculpatory statements made by Brian to a prosecutorial investigator during the trial; and second, that the People failed to disclose to the defense or to provide the defense with a copy of a police report indicating that a pellet gun which had previously been examined by a defense investigator had been discovered on the floor of Rohrer's car. The trial court denied the motion and sentenced Salazar to sixteen years in the custody of the Department of Corrections. On appeal, Salazar again argued that he was prejudiced by the alleged discovery violations noted in his motion for new trial, and also contended that he was prejudiced by the

untimely disclosure of a ballistics report prepared by the People's expert prior to trial. The court of appeals affirmed Salazar's convictions, finding no prejudice in the alleged discovery violations.

## II. The alleged discovery violations

### A. The ballistics report

The first alleged discovery violation involves the People's untimely disclosure of a ballistics report prepared by an expert for the prosecution. The report in question was prepared by ballistics expert, Lucien Haag, who the People retained to prove their argument that Salazar fired the shot which narrowly missed hitting the driver of the other vehicle. The People theorized that Salazar's shot passed through the driver's side window, narrowly missing the driver's head; hit the front windshield, cracking the windshield but not perforating it; then slid down behind the dashboard, decimating itself in the process so that the largest remaining piece of lead was no larger than the head of a pin. The bullet from Brian's pistol, the People theorized, was shot towards the ground and ended up lodged near the bottom of the driver's side door of Rael's vehicle. On January 4, 1991, Haag performed velocity tests with the .22 caliber pistol allegedly fired by Brian and the .22 caliber rifle allegedly fired by Salazar. Two days later, on January 6, he prepared a written report based on the results of those velocity tests. Three days later, on January 9, he was endorsed as a witness for the state. On January 10, 1991, Salazar was given a brief "overview report" discussing the tests performed by Haag and prepared by an officer of the Durango Police Department. This overview report stated that the "complete results of [Haag's] tests ... will be arriving in the near future." Salazar then filed a motion to strike Haag's endorsement and for a continuance based on the disclosure of this "undetailed and new" evidence just thirty days prior to trial.[2] The trial court scheduled a hearing on Salazar's

---

1. Though arrested and charged with attempted first-degree murder, Brian was bound over on the lesser charge of attempted first-degree assault. About two weeks prior to trial, Brian pleaded guilty to a lesser included offense and was sentenced to three years probation.

2. Salazar also moved for dismissal based on the grounds that through Haag's tests, the People destroyed evidence material to the case. The trial court's denial of this motion was not raised on appeal and is not now before us.

motion for January 18, 1991. On January 17, 1991, one day prior to the scheduled hearing, defense counsel went to the police station to view the driver's side door of the victim's vehicle which was allegedly struck by a bullet fired by Brian. While at the station, defense counsel first learned that the police were in possession of Haag's report. Defense counsel obtained Haag's report that afternoon.

At the January 18 hearing on the motion to strike Haag's endorsement and for a continuance, Salazar argued that Haag's endorsement was untimely and that, as a consequence, he was entitled to a continuance. Salazar argued the continuance was necessary so that defense counsel could review Haag's report, decide whether to devise other testing to counter Haag's work, discuss the financial ramifications of any defense effort to counter such a report, and, if necessary, hire an expert to prepare a defense to Haag's anticipated testimony. The trial court denied the motion, finding that the endorsement of Haag was timely and was not prejudicial in that defense counsel had adequate time to perform his own tests and to prepare a defense.

On appeal, Salazar argued that he was prejudiced by the late disclosure of Haag's report. Emphasizing Salazar's failure to contact Haag after Haag was endorsed but before Salazar received Haag's report, the court of appeals found no abuse of discretion in the trial court's denial of Salazar's motion for a continuance or in the court's admission of Haag's report and testimony.[3] *Salazar*, No. 91CA0846, slip op. at 4.

## B. Brian's statements to the People's investigator

The second claimed discovery violation arises from statements made by Brian Salazar, the defendant's brother, to the People's investigator. During the trial, the district attorney interviewed Brian in response to Salazar's trial testimony that after he (Salazar) fired his gun once "in the air," he heard two additional shots which he attributed to Brian. A district attorney investigator, Charles Bower, conducted the interview. According to Bower, Brian stated that he fired one shot only at the victim's car.[4] When Bower asked Brian if he was sure, Brian responded affirmatively. Bower then relayed this information to the prosecutor in the courtroom. About forty minutes later, the prosecutor requested that Bower ask Brian if there was any possibility that his one shot could have struck the window to the car door. Bower testified that Brian responded negatively to this question, and when Bower asked if he was sure, Brian turned around, pointed his finger down towards the ground, and said "no, it was just like that, down."[5] Subsequently, in a tape-recorded interview occurring after the trial and conducted by an investigator for the defense, Brian presented a different version of his response to Bower's question. Brian said that he told Bower "it was possible, it was very possible" that he (Brian) fired a second shot. Later, at the hearing on Salazar's motion for a new trial, Brian testified that when Bower asked if it was possible that he had fired two shots, he said "[t]o tell the truth, I don't know. It may be, maybe not, I don't know."

In denying the motion for a new trial, the trial court rejected Salazar's argument that Brian's statements should have been disclosed to the defense. The trial court held that Brian's statement was not credible and

3. The court of appeals did not determine whether the late disclosure constituted a violation of Crim.P. 16, and the record is silent on whether the report was in the People's possession for any length of time prior to the time that it was given to defense counsel. If the report was not in the People's possession prior to that time, it is argued that the late disclosure would not have constituted a violation of Crim.P. 16. *See* discussion pp. 1219–20 *infra;* Crim.P. 16(I)(a)(3) ("The prosecuting attorney's obligations under this section (a) extend to material and information in the possession or control of members of his staff and of any others who have participated in the investigation or evaluation of the case and who regularly report, or with reference to the particular case have reported, to his office.").

4. Bower testified to these facts at the hearing on Salazar's motion for a new trial.

5. Although endorsed by both the prosecution and the defense, Brian was not called to testify at trial. Nor did the defense seek to interview Brian before trial although both the People and Brian's counsel offered Brian for interview prior to trial.

that even if it was believed it merely presented the possibility, not the probability, that a third shot was fired, and therefore lacked probative value. The court of appeals also rejected Salazar's contention, finding that the People were under no duty pursuant to Crim.P. 16(I)(a)(1)(I) to disclose unrecorded *oral* interviews, and that there was no violation of the prosecution's constitutional duty to disclose exculpatory information because "this controverted testimony by the defendant's brother fails to undermine the verdict, and there is not a reasonable probability that the outcome would have been different, [had the statements been disclosed]." *Salazar*, No. 91CA0846, slip op. at 6–7.

### C. The pellet gun seized from Rohrer's car

The final claimed discovery violation concerns the People's failure to disclose a police report revealing that a pellet gun admitted into evidence had been discovered unloaded on the floor of the rear seat of Rohrer's car.[6] Although Salazar knew of the police seizure of the pellet gun, he did not find out that the gun had been discovered in Rohrer's automobile until the last day of trial testimony when he called to the witness stand Officer Tom Boyce, the police officer who confiscated the weapon from Rohrer's car. Up to that time, Salazar was apparently under the mistaken impression that the gun had been taken from Rohrer's residence.[7] Although surprised by Boyce's revelation, defense counsel did not request a continuance. Instead, he called defense expert Joseph Janson (Janson) to the witness stand, who indicated that of the three weapons at issue in the case, the .22 caliber rifle allegedly used by Salazar, the .22 caliber pistol allegedly used by Brian and the pellet gun, the pellet gun was most likely to fire a shot that would possess the characteristics of the shot which almost hit Rael, i.e., it would break the driver's window but not perforate the front windshield.

In his motion for a new trial, Salazar contended that the location of the discovery of the pellet gun was exculpatory information subject to mandatory disclosure in that the evidence would discredit the testimony of Rohrer since it would indicate that Rohrer fired the shot attributed by the People to Salazar. The trial court disagreed, finding that Salazar was aware of the gun's existence and of its retrieval by the police, and that the absence of the police report noting that the gun was seized from Rohrer's car "did not deprive the defendant of any evidence that would have aided the defendant additionally in his defense beyond the information disclosed." The court of appeals affirmed that court's ruling, finding no prejudice to Salazar because he was unable to prove a probability that disclosure of the evidence would have affected the outcome of the trial. *Salazar*, No. 91CA0846, slip op. at 9.

### III.

#### A.

We first address Salazar's argument that he was prejudiced by the late disclosure of Haag's report. Pursuant to Crim.P. 16(I)(a)(1)(III), where a prosecuting attorney is in "possession or control" of "[a]ny reports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments, or comparisons," those reports must be made available to the defendant. This disclosure shall be performed "as soon as practicable but not later than thirty days before trial." Crim.P. 16(I)(b)(3).

■ Here, there is no dispute that the disclosure was untimely as it was made 25 days prior to trial. Assuming this consti-

---

6. No allegation has been made and the facts do not indicate that the People's failure to disclose this report was in any way purposeful or malicious.

7. Prior to trial, defense counsel investigator John Biederman viewed the pellet gun, as well as the other physical evidence in the case, at the police station. While at the police station, Biederman asked Officer Jeff Watson where the gun had been discovered. Watson told him that he wasn't present when the gun was found, but that it was seized at a location or residence on Hillcrest Avenue. The property tag provided to the defense by the prosecution indicated that Officer Boyce had seized the gun and that the "location received" was "304 Hillcrest."

tutes a violation of Crim.P. 16,[8] it does not necessarily follow that the trial court's denial of Salazar's motion for a continuance is reversible error. Failure to comply with discovery rules is not reversible error absent a demonstration of prejudice to the defendant. *Chambers v. People*, 682 P.2d 1173, 1180 (Colo.1984); *People v. Kraemer*, 795 P.2d 1371 (Colo.App.1990). Salazar argues that the trial court's failure to grant a continuance was prejudicial because it denied him the necessary time to design and conduct new testing to challenge or refute Haag's findings.

■ We disagree. The record does not support Salazar's assertion that he was denied the ability to refute Haag's test results. At the time the report was disclosed, Salazar had already obtained the services of an expert witness who had examined the car door in question, and twenty-five days still remained to review Haag's report and perform additional tests if desired. Furthermore, the trial record does not indicate that Salazar was unprepared at the time of trial. At trial, defense counsel engaged Haag in a lengthy and detailed cross-examination regarding the tests he performed. Additionally, defense counsel called his own expert, Janson, to the stand both to critique Haag's results and to report the results of his own tests which cast doubt on Haag's conclusions. Moreover, Salazar fails to specify what additional tests or methods of rebuttal he would have employed had the continuance been granted; he argues only that "it was unfair to expect the petitioner to discover, design, and conduct new testing in only twenty-five days." Unfair or not, the trial record indicates that Salazar was able to do exactly what he argues the failure to grant a continuance prohibited him from doing—he designed his own tests to refute Haag's tests. Obviously, it may be argued that with more time Salazar could have developed more persuasive methods of rebutting the test results obtained by the prosecution, but we are presented with no evidence to that fact. As such, we are left with mere speculation as to exactly how Sala-

zar was harmed by the five-day delay in disclosure of the report. *See Chambers*, 682 P.2d at 1180 (finding no prejudice where the defendant failed to indicate how the belated production of a relevant scientific report prejudiced his case). We therefore affirm the holding of the court of appeals that Salazar failed to show he was prejudiced by the late disclosure of the prosecution's expert's report.

**B.**

We next address Salazar's argument that the trial court erred in not granting his motion for a new trial based on the failure of the prosecution to disclose statements made by Brian Salazar in an interview conducted by a prosecutorial investigator on the fourth day of the trial.

■ It is well-settled that a prosecuting attorney has both a statutory and a constitutional obligation to disclose to the defense any material, exculpatory evidence he possesses. *See* Crim.P. 16(I)(a)(2) ("The prosecuting attorney shall disclose to defense counsel any material or information within his possession or control which tends to negate the guilt of the accused as to the offense charged or would tend to reduce the punishment therefor."); *Brady v. Maryland*, 373 U.S. 83, 86–88, 83 S.Ct. 1194, 1196–1197, 10 L.Ed.2d 215 (1963) (holding that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution"); *United States v. Agurs*, 427 U.S. 97, 107–08, 96 S.Ct. 2392, 2399–2400, 49 L.Ed.2d 342 (1976) (expanding *Brady* to require disclosure of exculpatory material even where the defendant has made no specific request). As noted in *Brady*, however, failure to disclose information helpful to the accused results in a violation of due process only where the evidence is "material" either to guilt or to punishment. 373 U.S. at 87, 83 S.Ct. at 1196.

---

8. The People contend that no violation took place because there is no evidence that the People were in possession of the report prior to the date on which the report was disclosed to defendant's

counsel. For purposes of this appeal, we assume without deciding that the late disclosure constituted a violation of Crim.P. 16.

More specifically, there must be a "'reasonable probability' that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.'" *People v. District Court,* 808 P.2d 831, 834 (Colo.1991) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)); *see also People v. District Court,* 790 P.2d 332, 337–38 (Colo. 1990) (applying the *Bagley* test for disclosure); *People v. Thatcher,* 638 P.2d 760, 768 (Colo.1981) (reversal due to failure to disclose information to defendant is mandated only where outcome of trial may have been affected).

■ In the instant case, the exculpatory nature of the statement made by Brian to the prosecutor's investigator depends on which version of the statement is credited, the version reported by the prosecutor's investigator or the version reported by Brian at the hearing on his brother's motion for a new trial. The trial court found Brian's testimony at the motion for new trial hearing implausible, essentially making a finding of fact that the statement was not made. Noting the fact that Brian had previously informed the court under oath that he fired only one shot,[9] the court held as follows: "The court now, since I must also be the determinor of facts in this case and weigh the credibility of the witnesses' testimony, gives absolutely no weight whatsoever to the changed statement or the statement of the stated possibility."

We see no reason to disturb the trial court's finding of fact regarding Brian's statement to the People's investigator. The court's decision to afford "absolutely no weight" to the version of events reported by Brian at Salazar's motion for a new trial is supported by sufficient evidence in the record, including the testimony of the People's investigator, Charles Bower, that Brian said he fired one shot only and Brian's previous sworn statement that he fired one shot only. Although the record presents some conflicting evidence on this issue, the trial court's findings are entitled to deference unless "so clearly erroneous as to find no support in the record." *Peterson v. Ground Water Commission,* 195 Colo. 508, 516, 579 P.2d 629, 634–35 (1978). *See also Chambers v. People,* 682 P.2d 1173, 1180 (Colo.1984) (ruling that the trial court's findings of fact should not be disturbed on review where there is support in the record); *People in Interest of M.S.H.,* 656 P.2d 1294, 1297 (Colo.1983) ("Though the record presents conflicting evidence on some matters, it is the trial court's province to judge the credibility of the witnesses, the sufficiency, probative effect and weight of the evidence, and the inferences and conclusions to be drawn from the evidence."); *McClenny v. People,* 155 Colo. 202, 393 P.2d 736 (1964) (holding that the supreme court does not determine the degree of credibility which should attach to persons testifying in a district court) *cert. denied,* 379 U.S. 967, 85 S.Ct. 663, 13 L.Ed.2d 561 (1965); *People v. Lincoln,* 42 Colo.App. 512, 514, 601 P.2d 641, 642 (1979) ("It is for the trier of fact to determine the credibility of witnesses, and we are bound on review by that determination.").[10] Thus, having adopted the trial court's findings, we hold that Brian's statement is not subject to the mandatory disclosure provisions of Crim.P. 16(I)(a)(2) or the constitutional obligation to disclose exculpatory information.[11] We therefore affirm the

---

9. In entering a plea of guilty, Brian swore to the truth of the following version of the events in question:

 During the episode leading to my arrest and charges being subsequently filed against me, I did shoot once at David Rael's vehicle with a .22 caliber handgun. I fired one shot at the front left tire, but it appears that I hit the driver's door. I was only trying to scare the people in the vehicle. I am very sorry for what happened. I should not have fired my gun.

10. Salazar's argument that findings of credibility should be made by the jury mischaracterizes the issue here. At the time of trial there was no question of credibility to go to the jury because there was no testimony before the court that more than two shots had been fired.

11. Had Brian told Bower that it was possible he fired more than one shot, the People would have been compelled to disclose the statement pursuant to Crim.P. 16(I)(a)(2) because the statement certainly "tends to negate the guilt of the accused." As expressed previously, however, this would constitute reversible error only if the disclosure of the statement would present a reasonable probability of a different result. Here, the

holding of the court of appeals finding no abuse of discretion in the trial court's denial of the defendant's motion for a new trial based on the prosecution's failure to disclose Brian's alleged statement regarding the possibility that he fired two shots.

## C.

Finally, we review the People's failure to disclose the police report revealing that the pellet gun was discovered in the back seat of Rohrer's car.[12]

Salazar contends that like the alleged statement made by Brian to the prosecutor's investigator, this report constituted material, exculpatory information which the prosecution had a constitutional and statutory duty to disclose. Salazar argues that by failing to disclose Officer Boyce's report, the prosecution prevented "further" impeachment of Rohrer, the driver of the car, and of Haag, the expert witness for the prosecution, and prevented Salazar from presenting evidence corroborating his theory that three shots were fired from Rohrer's car. We disagree.

 First, we fail to see how the discovery of the pellet gun in Rohrer's car assists Salazar's three-shot theory. Throughout the trial, Salazar's theory of defense was that a third shot was fired which caused the damage to the victim's car which Salazar's shot was alleged to have caused. At trial, Salazar testified that after he fired his gun "in the air," he heard two additional shots. He attributed both of these additional shots to his brother, Brian, who was seated in the front passenger seat holding a pistol in his hand. The driver of the car, Rohrer, testified that he heard only two shots fired, one from Salazar in the back seat, the other a handgun shot fired from Brian's location in the front seat. Even Brian, in reaching his plea agreement, admitted to having fired one shot into the driver's side door with the .22 caliber

pistol. In the course of the entire trial, no evidence was presented that anyone fired any weapon other than the .22 caliber pistol admittedly held by Brian and the .22 caliber rifle admittedly held by Salazar. Thus, it is virtually impossible to reconcile the use of the pellet gun with the evidence presented at trial. If a third shot was fired by Brian, as the defense theorized, and the pellet gun was used for that shot, we are required to reach the incredible conclusion that Brian switched weapons within the brief span of a second or two between the second and third shots. Nor does it seem possible, in light of the evidence elicited at trial, that another passenger in the vehicle fired the third shot using the pellet gun. If the defense were to adopt such a theory, they would impeach the testimony of the defendant himself that Brian fired the third shot, and they would still be faced with proving an unlikely version of events supported by no evidence other than the fact that the pellet gun was found in Rohrer's car. We recognize that a prosecutor's duty to disclose potentially exculpatory evidence is not limited by the circumstances of known defense theories or considerations of relevancy. *People v. Shannon*, 683 P.2d 792, 795 (Colo.1984). Still, in order for reversible error to exist, the undisclosed evidence must be material to either the guilt or the punishment of the accused, i.e., there must be a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. *People v. District Court*, 808 P.2d 831, 834 (Colo.1991); Crim.P. 16(I)(a)(2). Here, where the only evidence linking the pellet gun to the shooting in question is its discovery in the back seat of the suspects' vehicle, we do not believe there is a reasonable probability that had the evidence been disclosed, the result of the trial would have been different.

Nor do we believe that the potential impeachment value of the evidence in question

___

trial court held that because Brian's alleged statement amounted to a mere possibility, not a probability, it had no probative value and was not material to the innocence or guilt of the accused or to the punishment received. Having resolved this matter by affirming the trial court's findings of fact, we express no opinion on the materiality of the alleged statement.

**12.** At oral argument, the People conceded that the failure to disclose this report constituted a violation of Crim.P. 16. Again, this alone does not establish reversible error.

creates the likelihood of a different result. Salazar argues that Rohrer's version of the incident would be called into doubt because he apparently overlooked the presence of the pellet gun in his recollection of the events of the night in question. Rohrer's failure to recall the existence of the pellet gun, however, could be readily explained by the simple fact that he did not see the weapon. Rohrer did not place the guns in his car, and there is no evidence that the pellet gun was held by any of Rohrer's passengers or used in the shooting. Thus, the logical conclusion from the evidence and testimony at trial is that Rohrer was simply unaware of the pellet gun's existence. Therefore, any attempt to impeach Rohrer on this basis would have little if any effect.

With regard to Haag, Salazar contends that the evidence that the pellet gun was discovered in Rohrer's car would have allowed him to confront Haag, who had testified that the small bullet fragments discovered in Rohrer's car were not consistent with the .22 caliber weapon used by Salazar,[13] with the "fact" that the more likely source of those fragments was the pellet gun found in the car.[14]

We reject Salazar's claim that he was denied the opportunity to cross-examine Haag on this matter simply because he did not know that the pellet gun had been taken from Rohrer's car. Even had the weapon been seized from Rohrer's house, as Salazar believed at the time of his cross-examination of Haag, it was confiscated in the course of the police investigation of Salazar's actions, and thus it should have seemed possible to Salazar that it was used in the shooting. Therefore, Salazar's failure to ask Haag about the characteristics of a projectile fired from a pellet gun cannot be explained by the People's failure to communicate the actual location of the pellet gun when seized by the police. Additionally, we believe that through his own expert, Janson, Salazar made the point that a pellet gun is the type of weapon which is likely to fire a projectile which would pass through the driver's side window but not perforate the front window, as occurred here. Presumably, this is essentially the same testimony which Salazar now argues he would have elicited from Haag had the report in question been disclosed to Salazar prior to trial.

Salazar also argues that had he known of the pellet gun's discovery in the back of Rohrer's car, he would have asked Haag why the gun was not tested with the .22 caliber rifle and pistol Haag used in performing his velocity tests. While it is possible that Haag's credibility could have been damaged by this type of questioning, we do not believe that this potential impeachment evidence creates a reasonable probability of a different result.

■ Additionally, we note that Salazar neither sought a continuance nor attempted to recall either Haag or Rohrer upon discovering that the pellet gun had been found in Rohrer's car. While not dispositive of the issue, this fact clearly weighs against a finding of prejudice in that it casts doubt upon Salazar's contention that the cross-examination of these witnesses in light of the surprise evidence would have been invaluable to his case. Cf. Chambers v. People, 682 P.2d 1173, 1180 (Colo.1984) (stating that where defendant did not request continuance, "the inference is inescapable that the delayed delivery of the report to the defendant did not prejudice his rights"); People v. Sepeda, 196 Colo. 13, 21, 581 P.2d 723, 729 (1978) (even where prejudice results from late endorsement of a witness, it "is not reversible error unless the defendant makes a timely request for a continuance which is denied by the trial court"). Salazar explains that he failed to move for a

13. Specifically, Haag testified on cross-examination that he would expect to find many small fragments such as the one which was recovered from behind the dash of Rohrer's car, but that he would also expect to find "a main mass of the bullet." He then explained that since the main mass was not discovered here, "my expectation is you're missing something, something's been lost."

14. Although we decide this issue in favor of the People, we reject the People's contention that this issue was not raised in the court of appeals. Salazar raised the issue below by noting Haag's testimony regarding the size of the bullet fragments, and asking what Haag "might ... have expected of a pellet, fired from a low velocity weapon."

continuance because he felt such a motion would be unsuccessful since his prior motion for a continuance, based on the late disclosure of Haag's report, was denied. Similarly, Salazar contends that any attempt to recall Haag would be futile because the witness had already been dismissed and had left the state. We disagree. Mere speculation regarding the court's disposition of a motion for a continuance or to recall a witness does not obviate the defendant's duty to seek such procedures if the defendant is to base his claim of prejudice on the inability to prepare new theories of defense or to cross-examine past witnesses in light of previously undisclosed evidence.

Finally, we emphasize the fact that well before trial, Salazar knew of the existence of the pellet gun, and knew that the gun had been seized by Officer Boyce. Despite his knowledge of these facts, Salazar did not perform any ballistics tests with the pellet gun, nor did he attempt to question Officer Boyce regarding the details of the seizure of the gun. Salazar's pre-trial belief that the gun had been discovered in Rohrer's house does not explain his seeming indifference to what he now argues to be a critical piece of evidence. Certainly, the pellet gun could have been used in the shooting whether it had been discovered in Rohrer's home or in Rohrer's car.

Therefore, we conclude that the evidence in question, the police report explaining that the pellet gun was discovered in Rohrer's car, was not material because there is no reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. We therefore affirm the holding of the court of appeals finding that the trial court did not commit reversible error in denying Salazar's motion for a new trial based on the prosecution's failure to disclose this evidence.

### IV.

In summary, we hold that the defendant, Lester Salazar, was not deprived of a fair trial due to alleged discovery violations on the part of the prosecution. First, we find no prejudice in the late disclosure of the ballistics testing report completed by the prosecution's expert. Second, we decline to disturb the trial court's findings of fact regarding the statement made to the People's investigator by Brian Salazar, and thus find that the statement was not exculpatory and not subject to mandatory disclosure. Finally, we hold that the police report which disclosed the location of the seizure of the pellet gun was not material evidence because there is not a reasonable probability that had the evidence been disclosed to the defense, the result of the proceeding would have been different. We therefore affirm the judgment of the court of appeals upholding Salazar's conviction.